IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| James A. Giles, | ) | C/A No. 0:10-959-DCN-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Doctor Allan Walls; Doctor Eillen Delaney; | ) | |
| Doctor Robert Poiletman; Mrs. Amy Enloe, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

The plaintiff, James A. Giles, filed this action seeking relief pursuant to 42 U.S.C. § 1983.

This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) DSC

for a Report and Recommendation on the defendants' motion for summary judgment. (ECF No. 30.)

By order of this court filed pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), the

plaintiff was advised of the dismissal and summary judgment procedures and the possible

consequences if he failed to respond adequately. (ECF No. 31.)  Giles filed a response in opposition

to the defendants' motion.  (ECF No. 40.)  The defendants replied (ECF No. 48) and Giles filed a

sur-reply (ECF No. 50).[1]  Having carefully considered the parties' submissions and the applicable

law, the court finds that the defendants' motion should be granted.

**BACKGROUND**

Giles's Complaint alleges that the defendants were deliberately indifferent to his medical

needs while he was housed with the South Carolina Department of Corrections ("SCDC").  Giles

---

[1] The Local Rules make no provision for sur-replies.  Further, under Local Civil Rule 7.07
DSC, "[r]eplies to responses are discouraged."  However, even considering Giles's sur-reply, it does
not change the court's analysis of the legal issues and its recommendation to grant summary
judgment.

PJG

alleges that each defendant was medically indifferent because, as medical personnel, they failed to

warn him of the possible side effects of the drug Seroquel, which was prescribed to him while at

SCDC. Giles alleges that he developed diabetes as a result of taking this medication. (See generally

Compl., ECF No. 1.)

## DISCUSSION

**A.    Summary Judgment Standard**

Summary judgment is appropriate only if the moving party "shows that there is no genuine

dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing

to particular parts of materials in the record" or by "showing that the materials cited do not establish

the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Rule 56 mandates entry of summary

judgment "against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving

party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party.

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."

Id. at 248.

The moving party has the burden of proving that summary judgment is appropriate. Once

the moving party makes this showing, however, the opposing party may not rest upon mere



allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(c), (e); Celotex Corp., 477 U.S. at 322.  Further, while the federal court is charged with liberally construing a complaint filed by a *pro se* litigant to allow the development of a potentially meritorious case, see, e.g., Cruz v. Beto, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact where none exists.  Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990).

**B.     Official Capacity Claims**

To the extent that the defendants are sued in their official capacities for monetary damages, they correctly assert that they are immune from suit in this court.  The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. art. XI.  Sovereign immunity protects both the State itself and its agencies, divisions, departments, officials, and other "arms of the State." See Will v. Michigan Dep't of State Police, 491 U.S. 58, 70 (1989); see also Regents of the Univ. of California v. Doe, 519 U.S. 425, 429 (1997) ("[I]t has long been settled that the reference [in the Eleventh Amendment] to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities.").  As arms of the state, they are entitled to sovereign immunity and cannot constitute "persons" under § 1983 in that capacity.  Will, 491 U.S. at 70-71; see also Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139 (1993) (stating that absent waiver

PJG

of Eleventh Amendment immunity, "neither a State nor agencies acting under its control may be subject to suit in federal court") (quotations and citations omitted).  Although a State may waive sovereign immunity, Lapides v. Board of Regents, 535 U.S. 613 (2002), the State of South Carolina has specifically denied this waiver for suit in federal district court.  See S.C. Code Ann. § 15-78-20(e).  Accordingly, to the extent the defendants are sued in their official capacities, they are immune from suit.  Will, 491 U.S. at 70-71; see also Quern v. Jordan, 440 U.S. 332, 343 (1979) (recognizing that Congress did not override the Eleventh Amendment when it created the remedy found in 42 U.S.C. § 1983 for civil rights violations).

## C.     Medical Indifference

Deliberate indifference by prison personnel to a prisoner's medical needs is actionable under § 1983 pursuant to the Eighth Amendment to the United States Constitution.  See Estelle v. Gamble, 429 U.S. 97, 104-105 (1976).  To establish a claim under the Eighth Amendment, an inmate must show:  (1) a sufficiently serious deprivation occurred, resulting "in the denial of the minimal civilized measure of life's necessities," and (2) the prison official had a sufficiently culpable state of mind. Farmer v. Brennan, 511 U.S. 825, 834 (1994).  To satisfy the second prong, an inmate must show that the prison official's state of mind was "deliberate indifference" to the inmate's health and safety.  Id.  A prison official is deliberately indifferent if he has actual knowledge of a substantial risk of harm to an inmate and disregards that substantial risk.  Id. at 847; Parrish v. Cleveland, 372 F.3d 294, 302 (4th Cir. 2004).  To be liable under this standard, the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.

PJG

Not "every claim by a prisoner [alleging] that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle, 429 U.S. at 105. To establish deliberate indifference, the treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). Mere negligence, malpractice, or incorrect diagnosis is not actionable under 42 U.S.C. § 1983. See Estelle, 429 U.S. at 106. While the Constitution requires a prison to provide inmates with medical care, it does not demand that a prisoner receive the treatment of his choice. Jackson v. Fair, 846 F.2d 811, 817 (1st Cir. 1988). "[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." Nelson v. Shuffman, 603 F.3d 439, 449 (8th Cir. 2010) (internal quotation marks & citation omitted) (alterations in original); see also Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

Giles alleges that the defendants were each medically indifferent because they did not inform him of the possible side effects from taking Seroquel. (See ECF. No. 1 at 3.) More specifically, Giles alleges that each defendant was deliberately indifferent by prescribing Seroquel despite "knowing the life threatening side affects [*sic*] which led to [Giles's] becoming a diabetic." (Id.) Giles also alleges that Nurse Enloe was medically indifferent because Nurse Enloe "was trying to down play the situation" pertaining to his elevated blood glucose levels.[2] (Id.) The record irrefutably shows that Giles was initially prescribed 300 milligrams ("mg") of Seroquel and that his dosage was

---

[2]This claim fails because although Giles may have perceived Nurse Enloe as being indifferent to his blood glucose levels, the unrefuted record reveals that Nurse Enloe did in fact treat him for symptoms. (See, e.g., Enloe Aff., ECF. 30-5; Med. Records, ECF 30-14 at 18-24.) Thus, no reasonable jury could find that Nurse Enloe disregarded any potential substantial risk to Giles.



gradually increased to 1000mg per day. (See id.) During his treatment with Seroquel, Giles's blood

sugar levels increased, which the record shows is a possible side effect of Seroquel. As a result,

Giles's Seroquel prescription was reduced and eventually discontinued. (See id.) Once Giles's

blood glucose levels became elevated, the levels were monitored by the defendants and other SCDC

staff. (See generally Med. Records, ECF No. 30-11.)

Dr. Walls attests that he never personally met with Giles and that his only interaction with

Giles was to prescribe him 300mg of Seroquel to be taken twice daily until December 17, 2007.

(See Med. Records, ECF No. 30-10 at 19.) Dr. Walls states that the purpose of the prescription was

to provide medication "until [Giles] could be seen in the mental health clinic." (Walls Aff. ¶ 7, ECF

No. 30-4 at 1.)

Dr. Poiletman attests that he personally saw Giles three times. (Poiletman Aff. ¶¶ 5, 13, and

15, ECF No. 30-7 at 1-2.) When Dr. Poiletman first saw Giles, he was already taking 300mg of

Seroquel twice a day, as prescribed by Dr. Walls. Dr. Poiletman attests that during this visit Giles

told him "[I] have done better while taking a higher dosage of Seroquel." (Id. at ¶ 7.) As a result

of Giles's statements, Dr. Poiletman attests that he increased the dosage of Seroquel to 400mg, twice

daily, because "[w]hen treating a patient for mental illness, it is not possible to do a lab test (e.g., a

blood test) to determine the appropriate medication to prescribe. Instead, this determination is made

by the symptoms reported by the patient and signs observed during exam." (Id. at ¶ 10.) During the

second visit between Giles and Dr. Poiletman, the record shows that Dr. Poiletman maintained the

dosage of Seroquel but prescribed an additional mental health drug, Haldol, to control Giles's

schizophrenia. (Med. Records, ECF No. 30-10 at 12-13.) The final time Dr. Poiletman saw Giles,

he noted that Giles was not taking Seroquel because Giles believed it caused him to get diabetes.

PJG

(Med. Records, ECF No. 30-14 at 14.)  Dr. Poiletman attests that he does not recall if he informed

Giles of the possible side effects of Seroquel.  However, he attests that "[his] general practice when

prescribing Seroquel to inmates . . . was to discuss with them possible side effects."  (Poiletman Aff.

¶ 11, ECF No. 30-7 at 2.)  Additionally, Dr. Poiletman notes that "[Giles] stated to him that he had

been taking [Seroquel] prior to his admission to SCDC and should have been aware of any potential

side effects."  (Id. at ¶ 12.)

Nurse Delaney[3] attests she saw Giles on several occasions and that she prescribed or changed

Giles's prescriptions, depending on the symptoms Giles expressed, several times throughout his

treatment.  (Delaney Aff. ¶¶ 9, 14, and 19, ECF No. 30-6 at 2.)  For example, when Giles requested

that his Seroquel dosage be increased to control his mood swings, Nurse Delaney states that she

subsequently increased Giles's dosage.  (See id. at ¶ 13.)  Nurse Delaney also states that she changed

Giles's prescription from Haldol to Invega because Giles was complaining about the side effects.

(See id. at ¶ 19.)  Additionally, Nurse Delaney attests that she maintained Giles's prescription of

800mg of Seroquel and Invega because Giles told her that he was feeling good.  (See id. at ¶¶ 14-16.)

Nurse Delaney attests she did not warn Giles of the possible side effects of Seroquel, in part, because

"[Giles] had been taking Seroquel before [she] saw him."  (Id. at ¶ 10.)

Nurse Enloe attests that she also saw Giles on several occasions and that during the course

of Giles's treatment, she authorized requests to continue Giles's medication.  (Enloe Aff. ¶¶ 9, 10,

and 15, ECF No. 30-5.)  However, Nurse Enloe states that she never prescribed or altered any dosage

of prescriptions for Giles.  (See id. at ¶ 12.)  Nurse Enloe also states that she did not warn Giles of

---

[3] In Giles's Complaint, he refers to "Doctor" Delaney.  The record reveals that Delaney is actually a nurse practitioner.



the side effects of the Seroquel because "[she] would not advise an inmate of the potential side effects of a medication if, as in this case, the inmate was taking the medication prior to his arrival at [SCDC]."  (Id. at ¶ 14.)

Taking the facts in the light most favorable to Giles and assuming that he was not specifically informed by SCDC personnel about the possible side effects of Seroquel, Giles has failed to provide any evidence that would rise to an actionable constitutional claim for medical indifference against the defendants.  On this record, failing to advise of the possible side effect of increased blood sugar from Seroquel cannot be said to be so "grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness."  Miltier, 896 F.2d at 851.  At most, failure to warn of possible side effects for prescribed medicine would be negligent.  (Burgess v. Mar, 395 Fed. App'x 368 (9th Cir. Sept. 7, 2010); Jetter v. Beard, 130 Fed. App'x 523, 526 (3d Cir. May 5, 2005); Jones v. Chandler, C/A No. 04-CV-1877 2005 WL 1941314, at *4 (E.D. Pa. Aug. 9, 2005)) As stated above, mere negligence is not actionable.  See Estelle, 429 U.S. at 106.

Additionally, once Giles was found to have elevated blood sugar levels, the record shows that the defendants "continued to monitor [Giles's] condition and provided appropriate treatment."[4] (Poiletman Aff. ¶ 20, ECF No. 30-7 at 3.)  While the defendants acknowledge that Seroquel may cause a patient's blood sugar to rise, they point out that a patient's "blood sugar may return to a normal range once the Seroquel is stopped."  (Id. at ¶ 25.)  In this case, the record reflects that as result of the side effects, Giles's prescription of Seroquel was lowered between August and September and subsequently discontinued in October of 2009.  (See Med. Records, ECF 30-9 at 15-

---

[4] Viewing the facts in the light most favorable to the plaintiff indicates increased fasting blood glucose levels over the values stated by the defendants because the glucose levels of the finger prick and lab tests vary.



17.) The prescription of Seroquel was not discontinued directly after the high blood glucose reading because Seroquel prescriptions "[can] not be stopped immediately." (Delaney Aff. ¶ 19, ECF No. 30-6 at 2.)  After the high blood glucose reading, Giles was also prescribed Glucophage[5] to control his blood glucose levels. (Med. Records, ECF No. 30-14 at 23.)  On this record, no reasonable jury could find that the defendants disregarded a substantial risk to Giles.  Moreover, the unrefuted evidence shows that once Giles started to show elevated blood glucose levels, they provided him with treatment and gradually discontinued his prescription of Seroquel to alleviate the elevated levels of blood glucose.

Moreover, even assuming the defendants were deliberately indifferent to Giles's serious medical needs, Giles cannot show that any such indifference caused him injury.  Although Giles claims that he developed diabetes as a result of his Seroquel prescription, he offers no expert medical opinion supporting this contention.  In fact, the only expert medical evidence in the record refutes Giles's speculation.  Dr. Poiletman attests that Giles's "blood sugar has been well maintained." (Poiletman Aff. ¶ 22, ECF No. 30-7 at 3.)  Additionally, Dr. Poiletman, Nurse Enloe, and Nurse Delaney each attest that Giles has many risk factors for diabetes.  Specifically, they attest that Giles is "overweight and could be characterized as obese" and that "there have also been problems with [Giles] being noncompliant with his diet." (Enloe Aff. ¶ 26, ECF No. 30-5 at 3; Delaney Aff. ¶ 22, ECF No. 30-6 at 2; Poiletman Aff. ¶ 24, ECF No. 30-7 at 3.)  Dr. Poiletman also attests that African Americans have a "significantly higher risk of diabetes than Caucasians." (Poiletman Aff. ¶ 24, ECF No. 30-7 at 3.)  Finally, Nurse Enloe attests that "[i]t is impossible to determine if the increase in

---

[5] Glucophage is a brand name of metformin, which is a medication "to improve glycemic control in type 2 [Diabetes Mellitus]." See Concise Monograph, Glucophage, PDR Network, http://www.pdr.net/drugpages/concisemonograph.aspx?concise=285 (last visited July 18, 2011).

Page 9 of 12



[Giles's] blood sugar was caused by taking Seroquel or due to his other risk factors." (Delaney Aff. ¶ 23, ECF No. 30-6 at 2.) Thus, Giles's claim fails because he does not present evidence or even refute the evidence provided by the defendants regarding his allegation that Seroquel caused him to develop diabetes. See 42 U.S.C. § 1983; Gibson v. Weber, 433 F.3d 642, 646 (8th Cir. 2006) (stating that to show deliberate indifference, an inmate must prove that prison officials knew about excessive risks to health but disregarded them, and that their unconstitutional acts *caused his injuries*). Moreover, a prisoner's disagreement as to the appropriate treatment fails to rise to the level of a constitutional claim and fails to create a genuine issue of material fact. See Nelson, 603 F.3d at 449; see also O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ("Lay people are not qualified to determine . . . medical fitness, whether physical or mental; that is what independent medical experts are for."); Dulany v. Carnahan, 132 F.3d 1234, 1240 (8th Cir. 1997) ("In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment."); Fleming v. Lefevere, 423 F. Supp. 2d 1064, 1070 (C.D. Cal. 2006) ("Plaintiff's own opinion as to the appropriate course of care does not create a triable issue of fact because he has not shown that he has any medical training or expertise upon which to base such an opinion.").

PJG

**RECOMMENDATION**

Based on the foregoing, no reasonable jury could find that the defendants were deliberately indifferent to Giles's medical needs.  Accordingly, the court recommends that the defendants' motion for summary judgement (ECF No. 30) be granted.

_____
Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

July 18, 2011
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).